1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JEREMY NAUMANN,

                        Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

                      Defendant.

Case No. C09-5563KLS

ORDER REVERSING THE
COMISSIONER'S DECISION TO DENY
BENEFITS AND REMANDING THIS
MATTER FOR FURTHER
ADMINISTRATIVE PROCEEDINGS

Plaintiff, Jeremy Naumann, has brought this matter before this Court for review of the

Commissioner's finding of non-disability and denial of his applications for disability insurance

and supplemental security income ("SSI") benefits.  The parties have consented to have this

matter heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of

Civil Procedure 73 and Local Rule MJR 13.  After reviewing the parties' briefs and the

remaining record, the Court finds that, for the reasons set forth below, the Commissioner erred in

determining plaintiff to be not disabled, and therefore hereby orders that this matter be remanded

to the Commissioner for further administrative proceedings.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is 32 years old.[1] Tr. 44.  He has an eleventh grade education and past

relevant work as a truck driver, store clerk, laborer, campground caretaker, and chipper/shovel

---

[1] Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public
Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the
United States.

ORDER - 1

operator. Tr. 40, 90, 106, 111, 156, 341, 346.  On November 16, 2001, he filed an application for

disability insurance benefits, alleging disability as of September 15, 2000, due to a learning

disability, very low self-esteem and problems with anger and frustration. Tr. 20, 82-84, 105.  His

application was denied initially and on reconsideration. Tr. 20, 44, 46, 48, 54.

Although plaintiff requested a hearing before an administrative law judge ("ALJ"), and

one was scheduled for him, he did not appear at that hearing, whereupon, on June 18, 2003, the

ALJ dismissed plaintiff's request therefor. Tr. 20, 264.  On remand of the matter by the Appeals

Council for consideration as to whether good cause for plaintiff's failure to appear at the hearing

existed, the ALJ again dismissed his hearing request for failure to appear, and that dismissal this

time was affirmed by the Appeals Council. Tr. 20, 268-69.  Plaintiff did not seek further review

of the Appeals Council's decision. Tr. 20.

On February 11, 2004, plaintiff filed new applications for disability insurance and SSI

benefits, alleging disability as of July 25, 1999, due to depression, anger, back pain and a neck

problem. Tr. 20, 318-20, 340.  His applications once more were denied initially and on

reconsideration. Tr. 20, 277, 279, 289, 294, 784, 786-87.  A hearing was held before a different

ALJ on May 15, 2007, at which plaintiff, represented by counsel, appeared and testified, as did a

medical expert and a vocational expert. Tr. 794-840.

On July 23, 2007, the ALJ issued a decision, in which he determined plaintiff to be not

disabled, finding specifically in relevant part:

> (1)    at step one of the sequential disability evaluation process,[2] while plaintiff
>        had not engaged in substantial gainful activity since February 21, 2002,[3] the
>        earliest relevant date, he had done so since October 2, 2006[4];

---

[2] The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is
disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.  If the claimant is found disabled or not disabled at any
particular step, the disability determination is made at that step, and the sequential evaluation process ends. Id.

[3] The ALJ explained his use of this date as "**the earliest relevant date**" as follows:

ORDER - 2

(2)   at step two, plaintiff had "severe" impairments consisting of some degenerative disc changes with back pain, borderline intellectual functioning ("BIF"), a personality disorder, and an anger control disorder by history;

(3)   at step three, none of plaintiff's impairments met or medically equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings");

(4)   after step three but before step four, plaintiff had the residual functional

---

In the present case, the claimant has alleged a disability onset date earlier than the date his prior application was initially denied, inferring a request to reopen that claim.  Social Security Regulation No. 4 generally provides that if a claimant is dissatisfied with a determination or decision, but does not request further review within the stated time period, he or she loses the right to further review.  Under some circumstances prior applications may be reopened (20 CFR 404.987, .988, .989; 416.1487, .1488, .1489).

The undersigned has reviewed the evidence and does not find sufficient ground to reopen the claimant's prior application, and declines to do so.  The issue of disability through February 20, 2002, the date of the prior . . . initial determination, was addressed in the initial determination of the date and that the doctrine of administrative finality applies to the issue of disability of the claimant through that date. . . .

Tr. 31, 33 (emphasis in original).

[4] Here, the ALJ specifically found in relevant part as follows:

The claimant's earnings record shows some income in 2002 and 2003, at less than SGA [significant gainful activity] levels.  He testified that he had tried working at a number of jobs since 2002, but they did not last.

The claimant also has earnings from October 2006 to March 2007, which were apparently above SGA criteria (exhibit B-7D).  He testified that this represented wages as a truck driver for a family business, working 20-40 hours per week, and he has continued to do so, earning in excess of $900 a month.

The claimant said that he was able to work at his own pace at this job; his father (the business owner) considered him "his number one driver."  It would appear that any accommodation at this job is not significantly greater than a non-impaired person, and that the claimant is performing work at SGA levels consistent with drivers generally . . .

Accordingly, the undersigned finds that the claimant has engaged in SGA since October 2, 2006 (exhibit B-7D:5).  Because the claimant is engaging in substantial gainful activity since that date, he is not disabled within the meaning of the Social Security Act.  It is therefore not necessary to consider the remaining steps in the sequential evaluation process for the time period beginning October 2, 2006.

Tr. 33; see also Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant not entitled to disability benefits for any period of time during which he or she has engaged in substantial gainful activity); 20 C.F.R. § 404.1520(a)(4)(i), (b); 20 C.F.R. § 416.920(a)(4)(i), (b).  Plaintiff does not challenge the ALJ's step one finding, or the determination of non-disability as of October 2, 2006, based thereon, other than to state in his reply brief "further review should be provided to determine if that work attempt was successful, and if he was able to maintain SGA." (Dkt. #13, p. 10).  But plaintiff provides no actual argument as to how specifically he feels the ALJ erred here, and thus the Court finds he has presented an insufficient basis for overturning the ALJ's step one determination here.

ORDER - 3

capacity ("RCF") to perform light exertional work, but with certain
additional non-exertional limitations[5];

(5)     at step four, plaintiff was unable to perform his past relevant work; and

(6)     at step five, plaintiff was capable of performing other jobs existing in
significant numbers in the national economy.

Tr. 20-41. Plaintiff's request for review was denied by the Appeals Council on July 31, 2009,

making the ALJ's decision the Commissioner's final decision. Tr. 11; 20 C.F.R.§404.981,§

416.1481.

On September 16, 2009, plaintiff filed a complaint in this Court seeking review of the

ALJ's decision. (Dkt. #1). The administrative record was filed with the Court on November 17,

2009. (Dkt. #10). Plaintiff argues the ALJ's decision should be reversed and remanded to the

Commissioner for further administrative proceedings for the following reasons:

(a)     the ALJ erred in failing to comment on plaintiff's depressive disorder at step
two of the sequential disability evaluation process;

(b)     the ALJ erred in evaluating the medical evidence in the record;

(c)     the ALJ erred in assessing plaintiff's credibility;

(d)     the ALJ erred in evaluating the lay witness evidence in the record;

(e)     the ALJ erred in assessing plaintiff's residual functional capacity ("RFC");
and

(f)     the ALJ erred in posing a less restrictive hypothetical question to the
vocational expert than was reflected in her assessment of plaintiff's RFC.

As noted above, the undersigned agrees the ALJ erred in determining plaintiff to be not disabled,

and therefore, for the reasons set forth below, hereby orders that this matter be remanded to the

Commissioner for further administrative proceedings. Although plaintiff requests oral argument,

---

[5] "Exertional limitations" are those that only affect the claimant's "ability to meet the strength demands of jobs." 20
C.F.R. § 404.1569a(b). "Nonexertional limitations" only affect the claimant's "ability to meet the demands of jobs
other than the strength demands." 20 C.F.R. § 404.1569a(c)(1).

ORDER - 4

1    the undersigned finds such argument to be unnecessary here.

2                                   DISCUSSION

3          This Court must uphold the Commissioner's determination that plaintiff is not disabled if

4    the Commissioner applied the proper legal standard and there is substantial evidence in the

5    record as a whole to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir.

6    1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as

7    adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v.

8    Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a

9    preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v.

10   Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one

11   rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler,

12   749 F.2d 577, 579 (9th Cir. 1984).

13   I.     The ALJ's Step Two Analysis

14          At step two of the sequential disability evaluation process, the ALJ must determine if an

15   impairment is "severe." 20 C.F.R.§404.1520,§416.920.  An impairment is "not severe" if it does

16   not "significantly limit" a claimant's mental or physical abilities to do basic work activities. 20

17   C.F.R.§404.1520(a)(4)(iii), (c),§416.920(a)(4)(iii), (c); Social Security Ruling ("SSR") 96-3p,

18   1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes necessary to do

19   most jobs." 20 C.F.R.§404.1521(b),§416.921(b); SSR 85- 28, 1985 WL 56856 *3.

20          An impairment is not severe only if the evidence establishes a slight abnormality that has

21   "no more than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL

22   56856 *3; Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d

23   303, 306 (9th Cir.1988).  Plaintiff has the burden of proving that his "impairments or their

ORDER - 5

symptoms affect [his] ability to perform basic work activities." <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1159-60 (9th Cir. 2001); <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998).  The step two inquiry described above, however, is a *de minimis* screening device used to dispose of groundless claims.  <u>Smolen</u>, 80 F.3d at 1290.

      As noted above, the ALJ found plaintiff had severe impairments consisting of some degenerative disc changes with back pain, BIF, a personality disorder, and an anger control disorder by history.  Tr. 33.  Plaintiff argues the ALJ erred in failing to also find he had a severe depressive disorder, noting he testified at the hearing that his depression was so severe that it sapped his energy and made him not feel like doing anything about half the time.  But at step two, although the ALJ must take into account a claimant's pain and other symptoms (<u>see</u> 20 C.F.R.§404.1529; <u>Smolen v. Chater</u>, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing 20 C.F.R.§ 404.1529(d)(2), SSR 88-13 (concerning evaluation of pain and other symptoms) (superseded by SSR 95-5p (concerning consideration of allegations of pain and other symptoms in regard to assessment of RFC))), the severity determination ultimately is to be made solely on the basis of the objective medical evidence in the record:

> A determination that an impairment(s) is not severe requires a careful evaluation of the medical findings which describe the impairment(s) and an informed judgment about its (their) limiting effects on the individual's physical and mental ability(ies) to perform basic work activities; thus, an assessment of function is inherent in the medical evaluation process itself.  <u>At the second step of sequential evaluation [process], then, medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities</u>.  If this assessment shows the individual to have the physical and mental ability(ies) necessary to perform such activities, no evaluation of past work (or of age, education, work experience) is needed.  Rather, it is reasonable to conclude, based on the minimal impact of the impairment(s), that the individual is capable of engaging in SGA.

SSR 85-28, 1985 WL 56856 *4 (emphasis added).  The mere fact that a depressive disorder or another mental health condition has been diagnosed, furthermore, is not by itself sufficient to

ORDER - 6

1  establish the existence of significant work-related limitations. <u>See</u> <u>Matthews v. Shalala</u>, 10 F.3d

2  678, 680 (9th Cir. 1993) (mere existence of impairment is insufficient proof of disability).  For

3  the same reason, while suicide attempts may be indicative of a serious mental health condition,

4  they do not alone indicate the presence of serious work-related limitations.  Moreover, for all of

5  the reasons set forth below, the ALJ did not err in not adopting any mental limitations from the

6  medical opinion sources in the record related to his diagnosed depressive disorder that are more

7  severe than those assessed by the ALJ.

8

9  II.      The ALJ's Evaluation of the Medical Evidence in the Record

10        The ALJ is responsible for determining credibility and resolving ambiguities and

11  conflicts in the medical evidence. <u>Reddick v. Chater</u>, 157 F.3d 715, 722 (9th Cir. 1998).  Where

12  the medical evidence in the record is not conclusive, "questions of credibility and resolution of

13  conflicts" are solely the functions of the ALJ. <u>Sample v. Schweiker</u>, 694 F.2d 639, 642 (9th Cir.

14  1982).  In such cases, "the ALJ's conclusion must be upheld." <u>Morgan</u>, 169 F.3d at 601.

15  Determining whether inconsistencies in the medical evidence "are material (or are in fact

16  inconsistencies at all) and whether certain factors are relevant to discount" the opinions of

17  medical experts "falls within this responsibility." <u>Id.</u> at 603.

18

19        In resolving questions of credibility and conflicts in the evidence, an ALJ's findings

20  "must be supported by specific, cogent reasons." <u>Reddick</u>, 157 F.3d at 725.  The ALJ can do this

21  "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence,

22  stating his interpretation thereof, and making findings." <u>Id.</u>  The ALJ also may draw inferences

23  "logically flowing from the evidence." <u>Sample</u>, 694 F.2d at 642.  Further, the Court itself may

24  draw "specific and legitimate inferences from the ALJ's opinion." <u>Magallanes v. Bowen</u>, 881

25  F.2d 747, 755, (9th Cir. 1989).

26

ORDER - 7

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. <u>Lester</u>, 81 F.3d at 830.  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." <u>Id.</u> at 830-31.  However, the ALJ "need not discuss all evidence presented" to him or her. <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected." <u>Id.</u>; <u>see also</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3rd Cir. 1981); <u>Garfield v. Schweiker</u>, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. <u>Lester</u>, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." <u>Batson v. Commissioner of Social Security Administration</u>, 359 F.3d 1190, 1195 (9th Cir. 2004); <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir. 2002); <u>Tonapetyan</u>, 242 F.3d at 1149.  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." <u>Lester</u>, 81 F.3d at 830-31.  A non-examining physician's opinion may constitute substantial evidence if that opinion "is consistent with other independent evidence in the record." <u>Id.</u> at 830-31; <u>Tonapetyan</u>, 242 F.3d at 1149.

A.  <u>Dr. Kittimongcolporn</u>

Plaintiff argues the ALJ erred by not giving controlling weight to the opinions of his treating psychiatrist, which the ALJ dealt with as follows:

> Saowarut Kittimongcolporn, M.D., performed a psychiatric evaluation in
> August 2002, for reported depression and suicide attempt.  He described a

ORDER - 8

history of abuse, a sexual offender conviction, and special education in school. His mental status examination was good, with some limitations in immediate memory and concentration, calculation, fund of knowledge, and abstraction (exhibit 11F). Dr. Kittimongcolporn diagnosed a depressive disorder, rule out ADHD, mild mental retardation, and cannabis abuse in remission. The GAF [global assessment of functioning] was 50[6] (exhibit 11F:3). In November 2002 Dr. Kittimongcolporn reported that the claimant had a range of moderate to marked cognitive and social limitations, and was unlikely to be able to work "without support" (exhibit B-3F). That is considered, but the claimant's mental status functioning was uncertain, and Dr. Kittimongcolporn agreed that the claimant had improved with medication and needed further testing to clarify any cognitive problems (exhibit B-3F:4). These assessments are a bit equivocal and tentative and not adopted. However, the mental status examinations are noted and taken into account in assessing the claimant's functional capacity.

Tr. 36. The Court finds the ALJ erred in part in so finding.

At least in regard to the diagnosis of depression, the Court finds the ALJ did not err in declining to adopt Dr. Kittimongcolporn's opinions. As noted by the ALJ, despite an assessed GAF score of 50 in August 2002, plaintiff was observed to have experienced improvement in his depression thereafter. Tr. 251, 535, 541. Indeed, in November 2002, while moderate to marked mental functional limitations were assessed, Dr. Kittimongcolporn also noted that the results of treatment had been "[g]ood," and that plaintiff had been "free of depressive symptoms." Tr. 415-16. The ALJ, therefore, offered valid reasons here for rejecting any mental functional limitations stemming from Dr. Kittimongcolporn's diagnosed depressive disorder. See Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (discrepancies between medical opinion source's functional assessment and that source's clinical notes, recorded observations and other comments regarding claimant's capabilities is clear and convincing reason for declining to rely on that assessment);

---

[6] "A GAF score of 41-50 indicates '[s]erious symptoms . . . [or] serious impairment in social, occupational, or school functioning,' such as an inability to keep a job." Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007) (quoting Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) ("DSM-IV-TR") at 34); see also Cox v. Astrue, 495 F.3d 614, 620 n.5 (8th Cir. 2007); see also England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007) (GAF score of 50 reflects serious limitations in individual's general ability to perform basic tasks of daily life).

ORDER - 9

1    Weetman v. Sullivan, 877 F.2d 20, 23 (9th Cir. 1989).

2         The moderate to marked mental functional limitations Dr. Kittimongcolporn assessed in

3    November 2002, however, also were based in part on a diagnosis of mild mental retardation. See

4    Tr. 414-15.   Dr. Kittimongcolporn commented as well that in terms of the moderate to marked

5    limitations he found in the area of cognitive functioning, plaintiff was unable to "understand

6    certain simple words and had to refer to his significant other for explanation," and that there was

7    a "[s]ignificant impairment during [the] mental status exam[ination]." Tr. 415.  Plaintiff further

8    was found to be in need of "[s]upported employment," and while, as noted above, he had been

9    free of depressive symptoms, his "cognitive dysfunction" was "unlikely to improve," and the

10   amount of time it was estimated he would be limited to the extent noted by Dr. Kittimongcolporn

11   was "most likely indefinite" as a result thereof. Tr. 416.

12        The only reasons the ALJ appears to have provided for not adopting those limitations

13   related to plaintiff's mild mental retardation, were that plaintiff's mental functioning seemed to

14   be uncertain, and that Dr. Kittimongcolporn's assessments were "a bit equivocal and tentative."

15   Tr. 36.  The ALJ, however, does not explain in what way those examinations were uncertain or

16   exactly how Dr. Kittimongcolporn's assessments were equivocal and tentative.  The ALJ does

17   mention that Dr. Kittimongcolporn stated further psychological testing was needed, but only to

18   determine the "level of retardation" plaintiff had, and not whether or not he in fact was impaired.

19   Tr. 416 (emphasis added).  Nor does the Court see anything particularly uncertain or ambiguous

20   in regard to Dr. Kittimongcolporn's assessment of plaintiff's impairment or ability to function.

21   As such, the Court finds the ALJ erred here.

22        B.  Dr. Price

23        Plaintiff argues the ALJ failed as well to provide proper reasons for rejecting the opinion

24

25

26

ORDER - 10

of Richard Price, M.D.  The Court disagrees.  With respect to Dr. Price, the ALJ found:

> Richard Price, M.D., performed a consultative psychiatric evaluation of the claimant on May 26, 2004.  The claimant described long-term difficulty with learning, reading, focus, mood swings, a history of juvenile incarceration for a sex crime, and other problems (exhibit B-16F).  Dr. Price diagnosed BIF, intermittent explosive disorder, paraphilia in remission, and adjustment disorder, and [a] GAF of 40-45 (exhibit B-16F:3).  The claimant's cognitive functioning was limited, consistent with BIF, but his mental status testing was otherwise intact, even pretty good (exhibit B-16F:3), which does not support such a low GAF assessment.  Consistent with that conclusion, Dr. Price thought that the claimant was amiable and should have counseling to help him work; he could manage simple and repetitive tasks.  Dr. Price said that the claimant may not be able to handle regular employment, but should have a supervised work trial to verify his functional capacity (exhibit B-16F:4).  That report suggests that the claimant could perform simple and repetitive tasks; Dr. Price's other comments appear to be speculative and equivocal, and are given little weight.

Tr. 37.  As noted by the ALJ, the mental status examination was essentially unremarkable (see Tr. 566-67), which is inconsistent with the level of impairment a GAF score of 40 to 45 would indicate.

The Court further agrees with the ALJ that Dr. Price's statement that plaintiff "may not be able to handle regular employment," as opposed to some sort of "supervised" or "low demand job," is largely speculative, given the normal mental status findings and Dr. Price's comment that plaintiff seemed "to be benefitting significantly from medication." Tr. 568.  Indeed, Dr. Price went on to opine that "a supervised trial of work" was "the best way to determine" if plaintiff had the "ability to perform work activities on a consistent basis and maintain regular attendance in a workplace." Id.  Also highly equivocal is Dr. Price's statement that "a question" existed about whether plaintiff could "accept instructions from supervisors or interact with coworkers and the public," again given the normal mental status examination findings and improvement in functioning plaintiff experienced. Id.  Accordingly, the ALJ properly declined to adopt any of Dr. Price's more restrictive limitations.

ORDER - 11

C. Dr. Crabbe, Dr. Krueger, Dr. Houck, and Dr. Harrison

Plaintiff next argues the ALJ erred in rejecting the opinions of the following medical

sources: R. A. Crabbe, M.D., Keith Krueger, Ph.D., Trevelyan Houck, Ph.D., and Kristine S.

Harrison, Psy.D. In regard to those opinions, the ALJ found as follows:

> There are a number of [state agency] check-box assessment forms. R. [A.] Crabbe, M.D., reported that the claimant had a depressive disorder that caused moderate to marked limitations (exhibit B-6F), but this was only a "clinical impression" that required further evaluation to clarify (exhibit B-6F:3). In April 2003 Keith Krueger, Ph.D., assessed BIF and an adjustment disorder, with generally moderate limitations (exhibit B-8F). Dr. Krueger also considered possible paraphilia and a learning disorder. Dr. Krueger added that the claimant did not need counseling except to instill confidence to move forward, and that the best thing for the claimant would be to find steady work (exhibit B-8F:4)! That suggests that, to Dr. Krueger anyway, the claimant was fully capable of working.
>
> Trevelyan Houck, Ph.D., prepared a [state agency] assessment [form] in November 2003, also finding generally moderate limitations with a marked restriction from stress. Recent [psychological] testing showed IQ scores in the 70s (exhibit B-23F). The claimant demonstrated one small error in his mental status test, which was otherwise within normal limits (exhibit B-23F:5). The testing suggests no significant functional limitation, other than some problems consistent with lower IQ levels.
>
> In April 2004 Kristine Harrison, Psy.D., diagnosed depression, BIF, a history of paraphilia, and cognitive disorder NOS [not otherwise specified] (provisional), with marked difficulty exercising judgment, learning new tasks, and tolerating work stresses (exhibit B-24F). The evidence of depression was a bit inconsistent, and his mental status testing was intact, although he was somewhat slowed (exhibit B-24F:5).
>
> Dr. Krueger prepared another assessment in August 2005, diagnosing dysthymia and BIF. He did not assess particular limitations (that portion of the report is missing), but the mental status testing was fair, with some more significant limitations consistent with lower IQ levels (exhibit B-25F:6). In August 2006, Dr. Krueger prepared a similar report, finding that the claimant could perform simple tasks and moderate limitations otherwise, with a marked restriction managing stress (exhibit B-27F).
>
> These [state agency] assessment [forms] are taken into account, because they represent a longitudinal profile of the claimant's functioning, and were prepared after having some contact with the claimant. But they are check-box

ORDER - 12

forms with only sketchy narrative to explain the basis for the opinions presented.  The notes of mental status examination are also sketchy, but those examinations are fairly intact.  It does not appear that the claimant has had "marked" limitations in functioning, but he does have restrictions in cognitive and social areas.  These reports are given some weight, and were addressed (and effectively refuted) by the medical expert testimony.

Tr. 38.  The Court once more disagrees that the ALJ erred here.

### 1. Dr. Crabbe

In addition to noting that the mental status examination performed by Dr. Crabbe was "sketchy" – which it clearly is in the sense that no actual clinical findings concerning plaintiff's mental status were provided other than the checking of boxes – the ALJ also properly observed that Dr. Crabbe's conclusions appeared to consist solely of a "clinical impression" that required additional evaluation in order to clarify them. Id.; see also Tr. 428-30; Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983) (expressing preference for individualized medical opinions over check-off reports).  For example, Dr. Crabbe stated "[a] test of [plaintiff's] adaptive functioning" was needed to "quantify" the assessed functional limitations he indicated were present. Tr. 429. Dr. Crabbe also stated it was "difficult to say" if mental health intervention was likely to restore or substantially improve plaintiff's ability to work for pay in a regular and predictable manner, "as his IQ and adaptive functioning [were] unknown." Tr. 430 (opining further that plaintiff clearly had developmental disability that could only be properly delineated by comprehensive psychological testing, which Dr. Crabbe himself did not perform).  The ALJ, therefore, did not err in rejecting Dr. Crabbe's opinion for these reasons.

### 2. Dr. Krueger

Plaintiff argues the ALJ erred in finding Dr. Krueger's statement that the "best thing for him would be finding steady work," suggested he believed plaintiff was able to work in his early April 2003 opinion, since Dr. Krueger at the same time found him to be markedly limited in his

ORDER - 13

ability to tolerate the pressure and expectations of a normal work setting. Tr. 436-37. But it was not at all unreasonable for the ALJ to find Dr. Krueger's recommendation that plaintiff seek and obtain steady work suggested Dr. Krueger in fact believed him to be capable of such, and that it was inconsistent with a marked limitation in the ability to tolerate work stress. In addition, given that it is the ALJ who is solely responsible for resolving conflicts or ambiguities in the evidence, the ALJ also was not remiss in giving more credit to Dr. Krueger's narrative statement regarding plaintiff's overall ability to work than to the specific check-box limitation he marked previously on that same evaluation form.

Although plaintiff argues Dr. Krueger's statement here does not in itself establish that he is in fact capable of working, the relevant point here is that Dr. Krueger did believe this to be the case. Plaintiff further argues the ALJ was being disingenuous for then going on to reject the later opinions of Dr. Krueger, but the record simply does not support such a claim. Rather, the Court finds the ALJ provided valid reasons for rejecting them as well. For example, the ALJ expressly noted the state agency assessment form Dr. Krueger completed in August 2005, contained no specific mental functional limitations (albeit seemingly because that portion of the form was missing). Tr. 38. Further, the ALJ noted the primarily "fair" – and, as noted above, "sketchy" – mental status examination findings that would not be consistent with Dr. Krueger's statement later in the same form, that while "steady work would be desirable," it was unlikely that plaintiff would be able to obtain it on his own. Tr. 631-32.

The same reasons were given by the ALJ and apply to the August 2006 report completed by Dr. Krueger. See Tr. 680-82. Indeed, it should be noted that Dr. Krueger went on to state therein that a "job would be [a] better way for [plaintiff] to manage" his depression (rather than through mental health counseling), and that plaintiff's problems in being able to find work was

ORDER - 14

1    "more an issue of skill lev[el] than of [mental health] needs." Tr. 682.  Thus, for all of the above

2    reasons, the Court finds no error on the part of the ALJ here.

3        3.  Dr. Houck

4        Here, again, the ALJ noted the fact that the mental status examination performed by Dr.

5    Houck was largely within normal limits, and that the psychological testing she conducted for the

6    most part suggested "no significant functional limitation." Tr. 38, 613-16, 621-22.  As with the

7    opinions of the other medical sources the ALJ addressed, these were valid reasons for not fully

8    adopting Dr. Houck's findings and limitations.  In addition, although not specifically discussed

9    by the ALJ, the Court notes that Dr. Houck estimated plaintiff would be restricted to the extent

10   found for no longer than nine months. See Tr. 616; Tackett v. Apfel, 180 F.3d 1094, 1098 (9th

11   Cir. 1999) (claimant must show he or she suffers from medically determinable impairment that

12   can be expected to last for continuous period of not less than twelve months).  Accordingly, even

13   if Dr. Houck's findings and limitations were supported by testing and the mental status findings,

14   they do not meet the duration requirement to establish disability.

15       4.  Dr. Harrison

16       Once more, the ALJ properly noted the fairly normal mental status testing – except for

17   some seeming slowness in movement, speech and thinking – performed by Dr. Harrison here,

18   which does not support the marked mental functional limitations assessed, including the stated

19   likely need for special training and supervision. See Tr. 624-25, 627.  Given the dearth of clinical

20   findings to support that level of restriction, the Court cannot fault the ALJ for not fully adopting

21   Dr. Houck's opinions.

22       5.  Dr. Johnson

23       Plaintiff argues the ALJ erred in finding that the opinions of the above medical sources

"were addressed (and effectively refuted) by the medical expert testimony" from Dr. C. Richard Johnson. Tr. 38.  The Court agrees Dr. Johnson did not expressly so testify, but the only marked limitation Dr. Johnson found based on his review of the historical medical evidence in the record was with respect to maintaining social functioning. See Tr. 826.  That limitation is in line with the ALJ's own assessed restriction that plaintiff "**would work best without interaction with co-workers, the public, or supervisors**." Tr. 35 (emphasis in original).  In addition, Dr. Johnson testified that although at least one evaluation report in the record indicated plaintiff had a marked limitation in his "ability to respond appropriately to and tolerate [the] pressure[s] in a formal work setting," he was "working now," and seemed "to be functioning well in that job," although Dr. Johnson did find that job to be "a fairly unique" one, in that he worked for his father driving a truck, with "virtually no interaction with" other people. Tr. 827.

This additional testimony from Dr. Johnson strongly indicates he felt – unlike those other medical sources who found plaintiff could not handle the pressure and expectations of a normal work setting – that plaintiff currently was capable of doing so.  Further, as noted above, the ALJ already accounted for the marked limitation in social functioning that Dr. Johnson found as well. Thus, while it is true that Dr. Johnson in his testimony does not expressly discuss all of the above medical source opinions, that testimony does contradict many of the mental limitations contained therein.  Accordingly, here too the Court finds no error.

6.   Dr. Norfleet

The record contains a psychological report, dated December 21, 2001, from Beverly J. Norfleet, Psy.D., who diagnosed plaintiff with a learning disorder and an antisocial personality disorder, and who assessed him with a current GAF score of 50. Tr. 208.  In regard to plaintiff's prognosis, Dr. Norfleet found it to be "[p]oor to guarded," opining further in relevant part:

ORDER - 16

1
2
3
4
5
6
7
8
9
10

. . . He appears to have long-standing difficulty in positively relating to authority figures such as a boss or coworker with greater knowledge or experience.  He reports difficulty receiving criticism, and tends to protect against the uncomfortable emotions this generates in him with impulsive behavior such as walking off a job without thought of potential financial consequence.  This has resulted in dire consequences for him as he is currently homeless due to his inability to pay for rent.  He appears to be afraid of being overwhelmed by strong feelings such as anger and rather than be overwhelmed he walks away or acts impulsively.  These emotional and behavioral difficulties do not bode well for relationships in a work environment.  In order to function in a work environment, Mr. Naumann will need assistance in developing impulse control and anger management skills for the work place.  Without psychotherapeutic intervention, I would be concerned about Mr. Naumann's ability to maintain long-term employment.  His learning disability appears to be secondary to his emotional and behavioral difficulties.

11
12
13
14
15

. . .

Results from this evaluation suggest reasoning ability in the borderline range and average memory and hearing potential.  Mr. Naumann demonstrates the capacity for normal concentration and persistence.  During the evaluation he demonstrated social skills adequate to negotiate non-conflict situations.  His current adaptation to work environment without the above mentioned interventions is poor.

16
17
18
19
20
21
22
23
24

Tr. 209.  Plaintiff argues the ALJ was required to consider Dr. Norfleet's report and opinions, but did not do so, and therefore he erred.  In his decision, the ALJ stated that because "the doctrine of administrative finality" applied to the issue of plaintiff's disability through the date of initial determination of plaintiff's prior applications for disability benefits, February 20, 2002, the ALJ would only "address the issue of disability beginning February 21, 2002." Tr. 31.  The ALJ went on to state that any consideration of the evidence in the record dated prior to that date, would be "done only to establish a history of [plaintiff's] alleged impairments and [was] not intended as a *de facto* reopening of any prior application." Id.

25
26

Since Dr. Norfleet's report is dated before February 21, 2002, and because plaintiff has not specifically challenged the determination of the ALJ to not re-open the prior claim period –

ORDER - 17

other than to request that on remand the Commissioner consider whether that period should be re-opened – the ALJ did not err in failing to mention or discuss that report.  However, plaintiff argues this reason for failing to do so is improper, because the prior applications were dismissed only on the basis that he did not appear at his requested administrative hearing, and not because a determination as to whether he was disabled was made on the merits.  For purposes of finality in the administrative context, though, it does not matter that the prior applications were dismissed on the basis of procedural default as opposed to an actual decision on the merits, and plaintiff has cited to no legal authority stating the contrary.  Nor does Dr. Norfleet indicate anywhere in her report that she was providing an opinion as to anything other than plaintiff's current functioning, even though that report is dated just two months prior to the beginning of the period of time relevant to the determination of disability in this case.  See Tr. 209 ("His current adaptation to [a] work environment without the above mentioned interventions is poor.").

Accordingly, the ALJ was not obligated to consider Dr. Norfleet's report or the opinions contained therein.  On the other hand, as discussed above, the ALJ erred in his evaluation of the late November 2002 findings and opinions of Dr. Kittimongcolporn, which are attributable to the diagnosis of mild mental retardation.  In addition, Dr. Norfleet diagnosed a cognitive condition as well, namely a learning disorder, and such diagnosis, as just noted, was made just prior to the relevant beginning date in this matter.  As such, given that this matter is being remanded in part on the basis of the ALJ's errors in evaluating the cognitive impairment and limitations found by Dr. Kittimongcolporn, the Commissioner on remand also shall determine whether Dr. Norfleet's opinion has any bearing on the relevant time period, and, if so, give proper consideration thereto, along with the other relevant medical opinion source evidence in the record.

ORDER - 18

III.     The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ.  Sample, 694 F.2d at 642.  The Court should not "second-guess" this credibility determination.  Allen, 749 F.2d at 580.  In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001).

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints."  Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing."  Lester, 81 F.2d at 834.  The evidence as a whole must support a finding of malingering.  O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid."  Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996).  The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms.  Id.

Here, the ALJ found plaintiff's medically determinable impairments "could reasonably

ORDER - 19

be expected to produce some of the alleged symptoms, but [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely credible." Tr. 35. Plaintiff argues that in so finding, the ALJ failed in his duty to provide specific and legitimate, let alone clear and convincing, reasons for discounting his credibility. But plaintiff has taken this statement out of context, and ignores the more specific reasons the ALJ went on to provide later in his decision for not finding him to be fully credible, which the Court finds to be valid for the reasons set forth below.

The ALJ first discounted plaintiff's credibility on the basis that his allegations of back pain were not consistent with the objective medical evidence in the record, noting specifically that while the record contained clinical findings "consistent with some pain," it did not support a "severe back disorder" as alleged by plaintiff, other than in the sense the term "severe" is used to dispose of *de minimis*, i.e., groundless, claims at step two of the sequential disability evaluation process. See Tr. 37. A determination that a claimant's complaints are "inconsistent with clinical observations" can satisfy the clear and convincing requirement. Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998). The ALJ, therefore, provided a valid reason here for discounting plaintiff's credibility.

A claimant's pain testimony may not be rejected "solely because the degree of pain [or other subjective complaints] alleged is not supported by objective medical evidence." Orteza v. Shalala, 50 F.3d 748, 749-50 (9th Cir. 1995) (quoting Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir.1991) (en banc)) (emphasis added); see also Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir.2001); Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989); Byrnes v. Shalala, 60 F.3d 639, 641-42 (9th Cir. 1995). In this case, the ALJ provided other clear and convincing reasons for discounting plaintiff's credibility as well.

ORDER - 20

The ALJ, for example, noted that plaintiff had reported significant improvement in both his pain and depressive symptoms, and indeed that medication appeared to control the latter. See Tr. 37-38; Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999) (ALJ may discount claimant's credibility on basis of medical improvement); Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998). The ALJ also noted a number of fairly vigorous household chores and other daily activities plaintiff reported that he engaged in, which also is not consistent with allegations of disabling symptoms. Tr. 39; see Smolen, 80 F.3d at 1284 (ALJ may consider daily activities to reject claimant's testimony, if claimant is able to spend substantial part his or her day performing them or those activities are transferable to a work setting).

Perhaps most significantly, however, is the fourth and final reason the ALJ provided for discounting plaintiff's credibility:

> It is noted, of course, that the claimant has been able to return to work (exhibit 8F:1) as a commercial driver. The fact that he has returned to fairly vigorous work, without a showing of a significant improvement in functioning at the time he started working, demonstrates that he has been able to work throughout this period. An examination for his commercial driving license was negative for any significant problem (exhibit B-29F:1-3).

Tr. 39. Accordingly, the ALJ provided several clear and convincing reasons for finding plaintiff to be not fully credible, and therefore did not err in doing so.

IV.   The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision.

ORDER - 21

Id. at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

The record contains a written statement from plaintiff's mother, in which she sets forth her observations of plaintiff's symptoms and limitations. See Tr. 356-64.  With respect to those observations, the ALJ found as follows:

> The claimant's mother reported that the claimant cares for his son and manages personal care.  He went for walks, drove, and helped with some household chores.  She noted that he had trouble with stress, and needed some help because of pain (exhibit B-3E).  This report reflects her observations of the claimant and his behavior, and is credible to the extent that it is consistent with the medical evidence discussed above.

Tr. 39.  Plaintiff argues the ALJ's reasons for not fully crediting his mother's observations were insufficiently specific.  The Court agrees.  Plaintiff's mother's statement contains observations that indicate more severe limitations than the ALJ found in his assessment of plaintiff's residual functional capacity discussed below.  For example, she stated that plaintiff needed help with at least some of his personal tasks due to pain and with "any paperwork" due to not always being able to understand what he reads. Tr. 357.  She also stated that he had to take breaks when doing household tasks again due to pain, and that he did not handle stressful situations "well at all." Tr. 358, 362.  The ALJ erred in failing to provide germane reasons for not adopting the more serious observations of plaintiff's mother such as these.

V.    The ALJ's Assessment of Plaintiff's Residual Functional Capacity and the Hypothetical Question the ALJ Posed to the Vocational Expert

If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A claimant's residual functional capacity assessment is used at step four to

ORDER - 22

determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. Id.  It thus is what the claimant "can still do despite his or her limitations." Id.

A claimant's RFC is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. Tackett, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R.§ 404.1520(d), (e),§416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that description those limitations

ORDER - 23

he or she finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

As noted above, the ALJ assessed plaintiff with a residual functional capacity to perform light work, more specifically finding that:

> **. . . [H]e can sit and stand/walk 6 hours each in an 8-hour workday. He has no limitations operating hand or foot controls. He can frequently balance, stoop, kneel, and climb ramps and stairs. He cannot climb ladders, ropes and scaffolds. He can occasionally reach overhead with his right arm. He is capable of simple, repetitive tasks; he would work best in routine jobs, making judgments within the scope of simple, repetitive tasks. He would work best without interaction with co-workers, the public, or supervisors.**

Tr. 35 (emphasis in original). The ALJ posed a hypothetical question to the vocational expert at the administrative hearing, which reads in relevant part:

> . . . The records indicate that the claimant is exertionally limited as follows. He can occasionally lift 20 pounds, frequently ten. He can sit, stand or walk for six hours in an eight-hour day. He does not have any limitations regarding the operation of any hand or foot controls, i.e., pushing or pulling. He is precluded from performing jobs requiring climbing, ladders, ropes or scaffolding. He can frequently climb ramps, stairs, balance, stoop and knee[l].
>
> . . .
>
> . . . He has some limitation in occasional reaching overhead, at least at some point in time he did, occasional reaching overhead in his right hand, right arm. And he does not have any other physical limitations or restrictions. Assume that the non-exertional limitations or restrictions indicate that this individual is capable of performing simple, repetitive tasks. He can understand, remember and follow through on simple, repetitive tasks. He would work best in jobs which were relatively routine, and which he only had to make judgments within those simple, repetitive tasks. He works best with no more than occasional interaction with supervisors, co-workers and members of the public. . . .

Tr. 834. In response to that hypothetical question, the vocational expert testified that there were other jobs plaintiff could do. Tr. 834-35. Based on the vocational expert's testimony, the ALJ found plaintiff to be capable of performing other jobs existing in significant numbers in the national economy. Tr. 40-41.

ORDER - 24

Plaintiff argues the ALJ erred by posing a hypothetical question to the vocational expert, which was less restrictive than the residual functional capacity with which he assessed plaintiff. Specifically, plaintiff notes that while the ALJ found that plaintiff "**would work best without interaction with co-workers, the public, or supervisors**" in his assessment of plaintiff's RFC, the hypothetical question the ALJ posed to the vocational expert only limited plaintiff, as noted above, to "no more than occasional interaction" therewith. Tr. 35, 834.  The Court agrees that the latter limitation is significantly less restrictive than that included in plaintiff's residual functional capacity assessment.  In other words, a prohibition against any interaction with others is not at all the same as a maximum capability to so interact on an occasional basis.

VI.   Remand for Further Administrative Proceedings in this Matter Is Appropriate

The Court may remand this case "either for additional evidence and findings or to award benefits." Smolen, 80 F.3d at 1292.  Generally, when the Court reverses an ALJ's decision, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy," that "remand for an immediate award of benefits is appropriate." Id.

Benefits may be awarded where "the record has been fully developed" and "further administrative proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d 1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such

evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). Because issues remain with respect to the medical evidence in the record concerning plaintiff's cognitive impairment and limitations, the lay witness evidence in the record, and the ability of plaintiff to perform other jobs existing in significant numbers in the national economy, the Court finds remand to the Commissioner for further administrative proceedings in accordance with the findings contained herein to be appropriate.

As noted above, plaintiff requests that on remand the Commissioner re-consider whether the prior claim period be re-opened.  But, also as noted above, plaintiff does not put forth any reasons, legitimate or otherwise, as to why the ALJ erred in declining to do so in the first place. Nor has plaintiff provided any specific argument as to why it would be appropriate once again for the Commissioner to re-visit that issue.  Accordingly, the Court declines to order that this be done on remand, though the Commissioner certainly may choose to do so if that course of action is determined by him to be appropriate.

<u>CONCLUSION</u>

Based on the foregoing discussion, the Court finds the ALJ improperly determined plaintiff to be not disabled.  Accordingly, the ALJ's decision is REVERSED, and this matter hereby is REMANDED to the Commissioner for further administrative proceedings.

DATED this 30th day of August, 2010.



Karen L. Strombom
United States Magistrate Judge

ORDER - 26